Filed 8/28/20  In re K.M. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re K.M., a Person Coming Under the Juvenile Court Law. | B303631 (Los Angeles County Super. Ct. No. CK94318) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>D.C.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephanie M. Davis, Judge Pro Tempore. Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## I.     INTRODUCTION

D.C. (mother) appeals from the juvenile court's order terminating her parental rights to her eight-year-old son, K.M. (the child).  Mother contends the juvenile court erred when it found that the parental benefit exception to the termination of parental rights in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i)[1] did not apply.  We affirm.

## II.     BACKGROUND

A.     *Section 300 Petition*

On May 18, 2016, the Los Angeles County Department of Children and Family Services (Department) filed a petition on behalf of the child and his then two-year-old sister, J.U.,[2] under

_____

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     J.U. is not a subject of this appeal.

2

section 300 that alleged, as sustained by the juvenile court, the following counts:

"b-1:  [¶]  On 04/21/2016, the children['s] . . . mother . . . was under the influence of illicit drugs, while the children were in . . . mother's care and supervision.  On 04/21/2016, . . . mother possessed methamphetamine.  The children are of such a young age as to require constant care and supervision and . . . mother's illicit drug use interferes with providing regular care and supervision of the children.  On 04/21/2016, . . . mother was arrested for Use/Under the Influence of [a] Controlled Substance.  Such illicit drug use on the part of . . . mother endangers the children's physical health and safety and places the children at risk of serious physical harm, damage and danger.

"b-2:  [¶]  The child K[.]M[.]'s father[3] . . . has a pattern of engaging in criminal conduct with repeated arrests and periods of incarceration.  [F]ather's criminal convictions include Obstruct/Etc[.] Public Officer/Etc., Illegal Possession Any Assault Weapon, Felony Burglary 1st Degree and Street Gang Act: Convicted Felon.  In 2015, the child's father was sentenced to 104 months in prison and [six] years in prison for . . . father's criminal conduct.  Such criminal history and conduct on the part of . . . father endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger."

---

3       The child's father is not a party to this appeal.

B.      *Jurisdiction and Disposition Hearings*

At the August 3, 2016, jurisdiction hearing, the juvenile court sustained the section 300 petition's allegations and set the matter for a contested disposition hearing. At the August 15, 2016, disposition hearing, the juvenile court declared the child to be a dependent of the court, removed him from parental custody, and ordered mother to participate in a drug/alcohol program with aftercare, random weekly drug/alcohol testing, a 12-step program, parenting education, and individual counseling. The court ordered mother to have two, two-hour monitored visits with the child a week.[4] The child, who has Down syndrome,[5] intermittent asthma, and congenital heart disease, remained placed with his maternal grandmother.

C.      *Six-Month Review Period*

In its February 9, 2017, Status Review Report, the Department reported that mother contacted the social worker in November and December 2016 and complained that maternal grandmother had not permitted her to visit the child. Maternal grandmother reported that she permitted mother to visit the child whenever mother wanted. Maternal grandmother stated

---

[4]      The minute order also stated that visits were to be limited only by the monitor's availability.

[5]      According to the Multidisciplinary Assessment Team summary of findings, the child's "impairments" did not rise to the level of requiring mental health services.

4

that mother was a good mother and called the child every day. The child loved mother and was sad when mother left after visiting him. Maternal grandmother believed mother and the child had a "really good bond." Mother was not under the influence of drugs or alcohol when she visited the child.

Mother was not complying with court-ordered services. Between October 12 and December 29, 2016, mother had missed 12 random drug tests. She had not enrolled in a 12-step program (or obtained a sponsor), parenting classes, or individual counseling, and had not maintained contact with the social worker.

On January 3, 2017, maternal grandmother told the social worker that mother visited the family all day on December 31, 2016, and for four hours the following day. Mother visited the child weekly, with the visits lasting between two and four hours. The following day, maternal grandmother told the social worker that mother visited the child once or twice a week for several hours each visit.

The delivered service log showed that on February 16, 2017, the social worker spoke with mother at maternal grandmother's home. The social worker and mother spoke in private—maternal grandmother kept the child distracted in another room. Mother told the social worker she visited the child two or three times a week for several hours each visit—arriving around 8:00 a.m. and leaving around 6:00 p.m. Mother stated, "'My son is my best friend . . . we used to do everything together and he's not used to me not being there.'" The social worker reported that the child "seemed to be very bonded and connected" with mother and wanted to be around while she spoke with mother.

During the interview, maternal grandmother repeatedly had to take the child out of the room where the social worker and mother spoke. The child did not like being separated from mother and cried when he had to leave her. At one point, the child sat at the table with the social worker and mother and appeared to want to be part of the conversation. He seemed calmer, less aggressive, and more playful and interactive with the social worker while mother was present.

On March 10, 2017, mother called the social worker and stated that maternal grandmother was not answering her telephone and mother had not seen the child since the social worker interviewed mother at maternal grandmother's home on February 16, 2017. Mother said that maternal grandmother tried to start an argument with her at the end of every visit and she would "rather hear [her] son laugh over the phone [than] cry in front of [her] when [she had] to leave him."

Mother explained her close relationship with the child. When he was in her custody, she home-schooled him and he was able to speak a little. Currently, he was not speaking. She brushed his teeth and dressed him.

Mother called the social worker again on March 14, 2017, complaining that maternal grandmother would not let her see the child. She said that maternal grandmother told her after the social worker's February 16, 2017, meeting with mother at maternal grandmother's house that she would not allow mother to visit the child.

At the March 28, 2017, six-month review hearing, the juvenile court found that the Department had provided mother with reasonable services. It ordered the Department to prepare a written visitation schedule.

D.    *Twelve-Month Review Period*

In its July 18, 2017, Status Review Report, the Department reported that in early April, mother and maternal grandmother entered into a written visitation agreement pursuant to which mother would visit the child on Fridays from 2:45 p.m. to 4:45 p.m.  Mother agreed to give 24 hours' notice if she had to cancel a visit and that the Department could cancel a visit if she was more than 15 minutes late.

After a couple of weeks, mother started arriving late for visits and missed visits without notifying the social worker. Mother missed visits on April 14; May 5; May 12; May 19; May 26, which was cancelled due to an emergency in the social worker's caseload; and June 2, 2017.

On June 6, 2017, maternal grandmother passed away.  On June 13, 2017, the child was placed in foster care with S.W.

At the end of June 2017, the Department filed a section 388 petition requesting that the juvenile court limit mother's visits to once a month for two hours in a Department office.  The petition alleged that maternal grandmother's male companion informed the Department that mother and an unknown male had abducted the child from maternal grandmother's backyard on June 3, 2017. Maternal grandmother's male companion called law enforcement. With the assistance of the Palmdale Sheriff's Department, paternal grandmother and an unknown male returned the child later that day.  The juvenile court granted the petition and ordered mother's visits with the child limited to two, two-hour visits a month in a Department office.

The delivered service log showed that on April 7, 2017, mother had a visit with the child at a Department office.

According to the social worker, mother was "extremely playful and active with her son during the visit. It was clear that the child . . . was comfortable in his mother's presence and seemed to have a close bond with her." The child was very active and mother was able to handle his "behaviors to some extent." Mother interacted positively and appropriately with him. She held the child and gently rocked him back and forth for about the final 30 minutes of the visit. At the end of the visit, the child began to cry and became upset when mother had to leave. Mother also had a difficult time saying goodbye.

During mother's April 21, 2017, visit with the child, she was very interactive and affectionate with him. The child was "very hyper and full of energy," but mother was patient with him and was able to keep up with him and keep him entertained. They watched a movie together.

During mother's April 28, 2017, visit with the child, the child appeared to be comfortable in mother's presence. Mother was playful, affectionate, and patient with the child and interacted with him appropriately. When the child cried, mother consoled him. They watched "Mickey's Clubhouse" on mother's portable DVD player.

On July 14, 2017, the child was placed with maternal relative K.A.

Mother visited the child on July 21, 2017. At the beginning of the visit, the child approached a woman sitting in the Department's lobby and stopped in front of her as though he thought she was mother. The social worker took the child to the visitation room where mother was waiting. Mother was appropriate with the child and they watched "Mickey's

8

Clubhouse" on mother's telephone. The child became upset at the end of the visit when mother said goodbye.

On July 28, 2017, mother failed to attend her visit with the child.

At the 12-month review hearing on October 25, 2017, the juvenile court found that mother had not complied with the case plan—she had not appeared for numerous drug tests, she had not properly maintained contact with the Department, and she had not consistently visited the child. It terminated mother's reunification services and set the matter for a section 366.26 permanent plan hearing.

E.    *Permanent Planning Period*

In the Department's February 21, 2018, section 366.26 report, the Department reported that the child was thriving under K.A.'s loving care and supervision. As for the child's medical and developmental diagnoses/conditions, K.A. had demonstrated her strong commitment to advocate on the child's behalf and was meeting his medical, dental, developmental, educational, and emotional needs. During the social worker's home visits, the child appeared to be "doing great" and was always well groomed and well dressed. K.S. had enrolled the child in school and secured special bus transportation for him. She had ensured that he continued to receive his speech/language therapy services and she actively participated in his individualized education plan (IEP) meetings and implementation. Rather that request respite care, K.A. included the child on family vacations for his continued enrichment and development.

Mother's visits with the child were scheduled to take place from 3:30 p.m. to 5:30 p.m. on Fridays. Mother showed signs of improvement in attending visits. Mother appeared loving, affectionate, and attentive toward the child during visits.

The Department reported in its May 23, 2018, Status Review Report that the child was thriving in his placement with K.A. who expressed a desire to adopt the child, but also to be his legal guardian if adoption efforts failed. Mother continued to visit the child twice monthly in a Department office, but her visits were inconsistent due to her "tardiness and forgetfulness of the scheduled dates of the visits." When mother did visit, she was appropriate, affectionate, and attentive toward the child's needs.

In its November 26, 2018, Status Review Report, the Department reported that the child was thriving in his placement with K.A. The child was regularly attending school and his overall vocabulary, communication, and self-expression had greatly improved since the start of his IEP and special education services in the fall of 2017.

Mother's visits with the child had been inconsistent because she was late and forgot scheduled visit dates. When mother was present, she was appropriate, affectionate, and attentive toward the child's needs. The child responded well to mother and appeared to be comfortable in her presence. He often became upset when visits ended. According to K.A., mother rarely called to speak with the child.

Mother failed to attend her visit with the child on May 18, 2018. Mother visited the child on June 1, July 13, July 27, and September 28, 2018. At the end of the July 27, 2018, visit, the child became upset and struck mother in the face

10

multiple times, continuing to strike her after she asked him to stop and restrained his hands. Mother suggested the child was learning "'rough-housing'" in his placement. After the September 28, 2018, visit, mother had not contacted the social worker to schedule a visit with the child.[6]

In its May 20, 2019, Status Review Report, the Department reported that the child was thriving in K.A.'s care and was comfortable in her presence. The child and K.A. seemed to have a loving bond with one another. Mother "continue[d] to have seldom communication" with the social worker and the child. Mother's visits with the child still were inconsistent due to her tardiness and forgetfulness of scheduled visit dates. Mother was affectionate and interactive with the child when she visited.

On June 19, 2019, mother filed a section 388 petition requesting the juvenile court return the child to her care or, alternatively, order additional reunification services. The petition stated that mother had enrolled in the Tarzana Treatment Center and was participating in substance abuse counseling, testing, a 12-step program, Narcotics Anonymous/Alcoholics Anonymous meetings, parenting classes, mental health treatment, group sessions, and anger management.

On June 21, 2019, the juvenile court summarily denied mother's section 388 petition. It found the request did not state new evidence or a change of circumstances and the proposed change of order was not in the child's best interest.

---

[6] The delivered service log attached to a later Department report reflects that mother had visits on November 2 and 16, 2018.

In an August 8, 2019, Last Minute Information for the Court, the Department informed the juvenile court that mother had improved in confirming visits with the social worker 24 hours in advance, but mother continued to be tardy for every visit. K.A. told the social worker that mother rarely spoke with the child on the telephone between visits.

The Department reported in its November 20, 2019, Status Review Report that K.A. had consistently and adequately provided for the child's physical, educational, and developmental needs. In the social worker's presence, the child always was well groomed, nicely dressed, clean, and physical healthy. The child appeared to be comfortable in his placement with K.A. and it was "apparent that there [was] a clear and loving bond between the child" and K.A.

Mother's visits with the child had been inconsistent. Even though mother was better about confirming visits with the social worker, she continued to arrive at visits between 25 and 60 minutes late. During visits, mother gave the child food and toys that she brought to the District's office. Mother often sat holding the child and watching cartoons for a majority of their visits. K.A. reported that mother rarely called to speak with the child. Weeks would pass without a telephone call from mother, then mother would call late at night when the child was already in bed or getting ready for bed. Mother would promise to call back in the morning or right after school when the child was home, but did not follow through.

At the January 3, 2020, section 366.26 hearing, mother testified that since the child began living with K.A. she visited him every chance "they" gave her—the first and last Friday of the month. She testified the visits were unmonitored and she had

not missed any offered visit in the prior 18 months.  She had been 10 to 15 minutes late for three visits, but always notified the social worker.  Since June 7, 2017, mother had tried to call the child every morning and every night but "they don't answer."

When visits took place, the child always waited for mother in the same chair and was excited to see her.  When he saw mother, he would jump up and run to her, hug her, and call her "my mom."  During visits, the child did not pay attention to anyone or anything else and would tell mother about his "days" and show her what he had done in school.  Mother and the child would work on arts and crafts, read, and watch Mickey Mouse on mother's telephone.  Mother brought washable markers, finger paints, crayons, coloring pages, and balls to visits.  She also helped the child with his schoolwork.  Mother never had to redirect or use discipline with the child during visits—when he was with her, he was "so great."

At the end of visits, the child gathered his and mother's things as though they were going to leave together.  When told that they were not, the child would scream and cry and try to take mother's hand to lead her in the direction in which he was going.  Mother would then sit with the child and comfort him, telling him he would see her again in two weeks.

Mother testified that she did not attend the child's medical appointments because K.A. and the social worker would not allow her to do so.  She last called one of the child's doctors to check on his well-being in May 2018.  In the prior year, mother had not participated in the child's daily care such as feeding and bathing him, although she fed him at visits.  K.A. and the social worker did not allow her to have contact with the child other than at visits.

13

Mother believed the child would be negatively impacted if his relationship with her were severed because the only time that he talked, ate, interacted, or opened up was when he was around mother. Otherwise, he closed and isolated himself. Mother learned about the child's behavior when they were not together from K.A.

At the conclusion of mother's testimony, the juvenile court continued the hearing. When the hearing resumed on January 7, 2020, mother's counsel argued that the juvenile court should find that the parental benefit exception to the termination of parental rights applied.

The juvenile court found mother's testimony "self-serving in a lot of instances and less than credible in a few." Mother had not maintained a parental bond with the child. There had not been consistent visitation. Visits were limited to two times a month "based on the factors that were of . . . mother's own doing." Also, mother's visits did not "equate to parenting sessions, which is basically what the visitation is to look like if the exception is to be applied." The juvenile court concluded that the permanence that the child would have from being adopted far outweighed any benefit that might be obtained from continuing a relationship with his parents and terminated mother's and father's parental rights.

## III.   DISCUSSION

A.   *Applicable Law*

"At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child." (*In re*

*Noah G.* (2016) 247 Cal.App.4th 1292, 1299, (*Noah G.*).) At this stage of the proceedings, the preferred plan is adoption. (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 645.) "First, the court determines whether there is clear and convincing evidence the child is likely to be adopted within a reasonable time. [Citations.] Then, if the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of the enumerated statutory exceptions applies." (*Id*. at pp. 645–646.)

"The parental benefit exception applies when there is a compelling reason that the termination of parental rights would be detrimental to the child. This exception can only be found when the parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).)" (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395 (*Anthony B.*); accord, *In re E.T.* (2018) 31 Cal.App.5th 68, 75–76.) For the benefit prong of the exception, "[t]he issue . . . is not whether there was a bond between [the parent] and [the child]. The question is whether that relationship remained so significant and compelling in [the child's] life that the benefit of preserving it outweighed the stability and benefits of adoption." (*Anthony B., supra*, 239 Cal.App.4th at p. 396.)

Various factors affect the parent-child bond, including "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) "[A] *parental* relationship is necessary for the exception to apply, not merely a

friendly or familiar one." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).) "Evidence of frequent and loving contact is not enough to establish a beneficial parental relationship." (*Noah G., supra,* 247 Cal.App.4th at p. 1300.) "The juvenile court may reject the parent's claim simply by finding that the relationship maintained during visitation does not benefit the child significantly enough to outweigh the strong preference for adoption." (*Jasmine D., supra,* 78 Cal.App.4th at p. 1350.)

B.    *Standard of Review*

There is a split of authority regarding the appropriate standard of review for determining whether the parental benefit exception to the termination of parental rights applies. (See *In re Caden C.* (2019) 34 Cal.App.5th 87, 106, review granted July 24, 2019, S255839.) "We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*Anthony B., supra,* 239 Cal.App.4th at p. 395.)

C.    *Analysis*

Mother failed to establish either that she maintained regular visitation and contact with the child or that the child would significantly benefit from continuing the relationship. Mother's visits with the child were sporadic. At times, such as when the child initially lived with maternal grandmother, mother

16

visited regularly.  But often mother was late for or missed visits. Due to her conduct, for the nearly two and a half years leading up to the section 366.26 hearing, mother had only two, two-hour visits a month.  (*In re C.F.* (2011) 193 Cal.App.4th 549, 554 ["Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption"].)  Mother also failed to maintain regular telephone contact with the child between visits.

As for the benefit prong, there is no doubt that mother and the child love each other, enjoy spending time with one another, and share a bond.  But mother failed to show she had a parental relationship with the child.  (*Jasmine D., supra*, 78 Cal.App.4th at p. 1350.)  The juvenile court removed the child from mother's custody on August 15, 2016, nearly three and a half years prior to the section 366.26 hearing.  For the nearly two and a half years before the hearing, mother's contact with the child was, on average, something less than four hours a month.  As mother admitted in her testimony, she was not involved with the child's daily care—feeding or bathing him—and did not attend his medical appointments or contact his doctors to check on his well-being.  Mother's relationship with the child was not so significant and compelling in the child's life that the benefit the child would have received in preserving it outweighed the stability and benefits of adoption.  (*Anthony B., supra*, 239 Cal.App.4th at p. 396.)

## IV.   DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


KIM, J.


We concur:


BAKER, Acting P. J.


MOOR, J.